UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RONALD A. MAJEWSKI,    : CIVIL NO: **3:CV-05-02396**
          Plaintiff  :
                    : (Judge Munley)
    v.                :
                    : (Magistrate Judge Smyser)
LUZERNE COUNTY, et al.,    :
          Defendants  :


## <u>REPORT AND RECOMMENDATION</u>


I.  Background and Procedural History.


    The plaintiff, Ronald A. Majewski, commenced this action by filing a complaint on November 18, 2005.  The plaintiff was proceeding *pro se* at the time that he filed his complaint.  However, the plaintiff subsequently retained counsel.  The plaintiff, through counsel, filed an amended complaint on January 10, 2006.


    The amended complaint names the following thirteen defendants: 1) Luzerne County; 2) the Luzerne County Correctional Facility (LCCF); 3) Gene Fischi, the Warden of the LCCF; 4) Samuel Hyder, a deputy warden at the LCCF; 5) Joseph Morris, a deputy warden at the LCCF; 6) Rowland Roberts, a deputy warden at the LCCF; 7) Gregory Skrepenak, a member of

the Luzerne County Prison Board; 8) Todd Vonderheid, a member

of the Luzerne County Prison Board; 9) Steve Urban, a member of

the Luzerne County Prison Board; 10) Wister Yuhas, a member of

the Luzerne County Prison Board; 11) Robert Payne, a member of

the Luzerne County Prison Board; 12) International Laborers'

Union of North America Local 1300 (Union); and 13) Tony

Seiwell, the business agent of the Union.

The plaintiff claims that the defendants violated his

constitutional and statutory rights as well as state law in

connection with his suspension and the termination of his

employment as a corrections officer at the LCCF.

The amended complaint contains nine counts.  Count I

consists of 42 U.S.C. § 1983 claims for violation of the First,

Fourth, Fifth, Sixth and Fourteenth Amendments to the United

States Constitution against all of the individual defendants.

Count II is a claim under 42 U.S.C. § 1985 against all of the

individual defendants.  Count III is a discrimination claim

against Luzerne County, the LCCF and the Union pursuant to the

Americans with Disabilities Act (ADA), 42 U.S.C. 12101, et seq.

Count IV is a retaliation claim against Luzerne County, the

LCCF and the Union pursuant to the ADA.  Count V is a claim

against all of the defendants pursuant to the Pennsylvania
Human Relations Act, 43 Pa.C.S.A. § 951, et seq.  Count VI is a
state law conspiracy claim against all of the individual
defendants.  Count VII is a claim against defendants Fischi,
Hyder and Morris pursuant to the Family and Medical Leave Act
(FMLA), 29 U.S.C. § 2601-et seq.  Count VIII is a state law
claim of intentional infliction of emotional distress against
all of the defendants.  Count IX is a state law claim of
wrongful discharge against Luzerne County, the LCCF and the
Union.

     On March 3, 2006, defendants Seiwell and the Union filed
an answer to the amended complaint.

     By a Memorandum and Order filed on April 9, 2007, the
plaintiff's Fourth Amendment, Fifth Amendment, Sixth Amendment
and Fourteenth Amendment procedural and substantive due process
claims were dismissed.  In addition, the plaintiff's 42 U.S.C.
§ 1985(3) claim, his claim for punitive damages under the
Americans with Disabilities Act and his claim for intentional
infliction of emotional distress were dismissed.

On April 18, 2007, defendants Luzerne County, LCCF,
Fischi, Hyder, Morris, Roberts, Skrepenak, Vonderheid, Urban,
Payne and Yuhas (hereinafter the "County defendants") filed an
answer to the amended complaint.

On October 15, 2007, defendants Seiwell and the Union
filed a motion for summary judgment, a statement of undisputed
material facts, a brief and documents in support of their
motion.  Also on October 15, 2007, the County defendants filed
a motion for summary judgment, a statement of material facts, a
brief and documents in support of their motion.  After
requesting and receiving several extensions of time, the
plaintiff filed a response to the statement of undisputed facts
of defendants Seiwell and the Union, a response to the
statement of material facts of the County defendants, a single
brief in opposition to both motions for summary judgment and
documents in support of his opposition.  On December 31, 2007,
the County defendants filed a reply brief.

II.  Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, the
discovery and disclosure materials on file, and any affidavits

4

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may discharge that burden by "'showing'-- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must "set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e).

An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law.  *Anderson*, *supra*, 477 U.S. at 248.  In determining whether an issue of material fact exists, the court

5

must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

III. Material Facts.

The following material facts are either undisputed for purposes of the defendants' motions for summary judgment or, where disputed, taken from the plaintiff's version of the facts as set forth in his affidavit.

6

The plaintiff commenced his employment at the LCCF in 1991. *Defendants Luzerne County, Luzerne County Correctional Facility, Gene Fischi, Samuel Hyder, Joseph Morris, Rowland Roberts, Gregory Skrepenak, Todd Vonderheid, Steven Urban, Robert Payne and Wister Yuhas' Statement of Material Facts as to Which No Genuine Issue Remains to be Tried* at ¶4 and *Plaintiff's Counterstatement of Facts to Luzerne County, et al's Statement of Material Facts* at ¶4.   On or about March 1, 1994, the plaintiff sustained a work-related injury. *Id.* at ¶5. The plaintiff had a herniated disk and had an operation on the disk on April 1, 1994. *Affidavit of Ronald A. Majewski* at ¶¶ 21 & 24.   Sometime after the surgery, it was discovered that the plaintiff had two more herniations. *Id.* at ¶26.   The plaintiff did not have a second back surgery. *Id.* at ¶27.   The plaintiff was on Workers' Compensation. *Id.* at ¶29.

On October 10, 2000, the plaintiff returned to work at the LCCF as a control booth guard - a permanent light duty job. *Id.* at ¶¶33-35.   The plaintiff was on the night shift - 11:00 p.m. to 7:00 a.m. *Id.* at ¶41.   Immediately upon his return to work, the plaintiff's coworkers became jealous of his light duty

position and began to harass him. *Id.* at ¶42.  The plaintiff

complained to the Union and his supervisors. *Id.* at ¶50.

In June of 2002, the plaintiff's coworkers circulated a

grievance regarding the plaintiff. *Id.* at ¶51.  With the

exception of one coworker, the plaintiff's entire shift signed

the grievance because they felt the plaintiff had too easy of a

job. *Id.* at ¶¶52-53.  As a result of the circulating grievance,

the plaintiff retained counsel - Attorney Paul Jennings. *Id.* at

¶57.  The plaintiff complained to the Warden and Deputy Warden.

*Id.* at ¶58.

On June 11, 2002, the plaintiff met with defendant Warden

Fischi. *Id.* at ¶59.  The plaintiff informed Fischi of the fact

that no on was talking to him, that he was isolated and that no

one wanted to work with him. *Id.* at ¶61.  He also informed

Fischi that the harassment included the grievance by his

coworkers and he asked Fischi to have them back off and cease

the harassment. *Id.* at ¶¶60 & 62.  Fischi told the plaintiff

that he had heard about the grievance, that the plaintiff was

not to deviate from his job description and that he would take

care of it. *Id.* at ¶63.

8

On June 17, 2002, Jennings, the plaintiff's attorney, sent a letter to the Warden and President of the Union. *Id.* at ¶64. Jennings' letter addressed the grievance by the plaintiff's coworkers and requested copies of documents relevant to the grievance. Doc. 84, Exhibit H.  Additionally, Jennings requested documents pursuant to the ADA. *Id.*  Jennings further indicated that the plaintiff was working under a medical accommodation pursuant to the ADA but that that medical accommodation did not restrict the plaintiff from working overtime on days that he is not scheduled for work. *Id.*

The plaintiff continued to be harassed due to his light duty position and he felt like he was retaliated against for complaining about the circulation of the grievance. *Affidavit of Ronald A. Majewski* at ¶65.

In November of 2002, defendant Seiwell was overheard stating that he was going to have the plaintiff fired. *Id.* at ¶65a.

Also in November of 2002, the plaintiff was given a three day suspension when his car broke down and he did not have a

way to work. *Id.* at ¶65b.  The plaintiff called the prison and asked for transportation. *Id.*   The prison refused to provide transportation although it had done so in the past. *Id.*  The plaintiff requested to use one of his sick days. *Id.*   That request was denied. *Id.*  The plaintiff states that others would have been allowed to do so. *Id.*  The plaintiff was suspended from December 2, 2002 to December 4, 2002. *Id.*

The plaintiff filed numerous grievances throughout 2002. *Id.* at ¶65d.

On December 3, 2002, Jennings sent a letter to defendant Fischi. *Doc. 84, Exhibit I.*  Jennings asserted that the suspension of the plaintiff was retaliation and he asserted that other employees were treated differently than the plaintiff with regard to the use of emergency vacation days. *Id.*  He also stated that the documents that he previously requested were not provided. *Id.*  Jennings requested a discussion to formulate a reasonable accommodation and he indicated that the plaintiff was considering the initiation of an Equal Employment Opportunity Commission (EEOC) complaint of harassment resulting from the June 17, 2002 letter. *Id.*   He

characterized the harassment as retaliation in violation of the ADA. *Id.*

On March 13, 2003, the plaintiff reported to Lieutenant Webby that someone had poured a sticky liquid on his vehicle. *Affidavit of Ronald A. Majewski* at ¶65i.  Nothing was done about this. *Id.*

On or about April 17, 2003, the plaintiff filed a complaint with the EEOC. *Defendants Luzerne County, Luzerne County Correctional Facility, Gene Fischi, Samuel Hyder, Joseph Morris, Rowland Roberts, Gregory Skrepenak, Todd Vonderheid, Steven Urban, Robert Payne and Wister Yuhas' Statement of Material Facts as to Which No Genuine Issue Remains to be Tried* at ¶7 and *Plaintiff's Counterstatement of Facts to Luzerne County, et al's Statement of Material Facts* at ¶7.

On May 5, 2003, the plaintiff was overlooked for overtime that was available. *Affidavit of Ronald A. Majewski* at ¶65o.

Defendant Roberts circulated a hand printed memo to the plaintiff's supervisors stating that if the plaintiff were to be more than 15 minutes late he was to be disallowed to report

for his duty shift. *Id.* at ¶65q.  Others were not held to this standard. *Id.*  The plaintiff provides examples of others who were late or missed work and were not disciplined. *See Id.* at ¶¶65c, e, g, k, l, m, n, p, s, u, w, ee & hh.

The plaintiff filed a declaration with the EEOC in August of 2003. *Id.* at ¶68; *Doc. 84, Exhibit JJ.*

On August 12, 2003, the plaintiff was written up at 11:15 as a no show. *Affidavit of Ronald A. Majewski* at ¶65r.

On September 24, 2003, defendant Fischi sent out a memo to all personnel implementing a late/no show policy after the policy had already been used against the plaintiff. *Id.* at ¶65t.

On October 21, 2003, Jennings sent a letter to Prison Board members asserting that the plaintiff was disabled and that he was being retaliated against due to his disability, due to his EEOC complaint and due to his counsel's (Jennings') previous letter. *Doc. 84, Exhibit Q.*  He cited to the Roberts' memo setting a particular policy to be followed when the plaintiff arrives fifteen minutes late for work. *Id.*  He also

12

stated that he still had not received a copy of the LCCF's current Code of Ethics and that no dialogue regarding reasonable accommodations under the ADA had been offered. *Id.*

On November 19, 2003, Jennings sent a letter to the assistant county solicitor indicating that his previous letters to Fischi and the Prison Board had been ignored. *Doc. 84, Exhibit R.*

On January 22, 2004, the plaintiff was told by a corrections officer that corrections officers had tried to get other shifts to file and/or sign a grievance against the plaintiff because of his job description. *Affidavit of Ronald A. Majewski* at ¶65x.

On February 3, 2004, the plaintiff called off sick due to his back. *Id.* at ¶65y.  Upon his return to work on February 4th, the plaintiff asked Captain Ottesman for emergency use of vacation days for his back. *Id.*  Ottesman informed the plaintiff that he was going to be written up for not calling off on the 3rd. *Id.*   When the plaintiff returned to work on February 6th with a doctor's note he was told by Captain Larson: "You're lucky this time." *Id.*

13

On February 12, 2004, Corrections Officer Morgan stated that he was working with that "fucking handicap again." *Id.* at ¶65z.  This statement was overheard by other corrections officers and a supervisor, but nothing was done. *Id.*

On February 25, 2004, the plaintiff was given an unsatisfactory evaluation by Lieutenant Seman and Lieutenant Webby for his response time to an "all available call." *Id.* at ¶65bb.  The plaintiff explained that his job description does not allow him to leave the control booth. *Id.*  The plaintiff was then told: "Oh well, I'll give you unsatisfactory for attendance also." *Id.*

On March 26, 2004, Captain Corridoni told the plaintiff that he was not allowed to use a personal holiday and that he must use a sick day because the contract was not signed yet. *Id.* at ¶65cc.  Others were using time as normal. *Id.*

On September 17, 2004, the plaintiff was twenty minutes late for work because of flooded streets. *Id.* at ¶65ff. Lieutenant Webby immediately called the Warden and told the plaintiff that the lateness was going into his personnel file

14

with a poor review. *Id.*  Other corrections officers were late

for the same reason and nothing was done to them. *Id.*

On October 20, 2004, the plaintiff was told by Lieutenant

Seman that Seman would write him up if he were to fail to

arrive at the prison by 10:55 p.m., even though his shift

started at 11:00 p.m. *Id.* at ¶65gg.

On November 11, 2004, upon walking into the muster

meeting, Lieutenant Seman told the plaintiff that he was going

to write the plaintiff up for being 30 seconds late. *Id.* at

¶65ii.  The plaintiff walked in with C.O. Pfiel but only the

plaintiff was reprimanded. *Id.*

There were more than 20 times in 2004 that the plaintiff

wasn't called for overtime when he should have been. *Id.* at

¶65jj.

In four and a half years, the plaintiff was late only

approximately six times. *Id.* at ¶66.

On December 6, 2004, the plaintiff reported to work as

normal between 10:45 p.m. and 10:50 p.m. *Id.* at ¶69.  After he

15

was checked for contraband, the plaintiff conversed with the guards. *Id.* at ¶70.  The plaintiff then looked at the schedule and found out that he was not on the schedule. *Id.* at ¶74.  He inquired with the supervisor and was told that someone had reported him off work today. *Id.* at ¶75.  The plaintiff informed the supervisor that he didn't call off sick. *Id.* at ¶76.  This was not the first time that the plaintiff was called off. *Id.* at ¶77.  He was called off several times before, and he complained of that to supervisors. *Id.*

On December 6, 2004, the supervisors on duty were Captain Corridoni, Lieutenant Seman and Lieutenant Webby. *Id.* at ¶79. The plaintiff was instructed to go to the muster meeting and was told that the supervisors would take care of the situation. *Id.* at ¶80.  A muster meeting is a quick five to ten minute briefing of the activities of the upcoming shift. *Id.* at ¶81. There are approximately 21 corrections officers at a muster meeting along with supervisors. *Id.* at ¶82.

The plaintiff then reported to his floor and started his shift. *Id.* at ¶83.  At approximately 2:30 a.m. (on December 7, 2004), the plaintiff was told that Captain Corridoni wanted to

see him in his office. *Id.* at ¶84.  The plaintiff went to
Corridoni's office and Captain Corrodoni, Lieutenant Seman,
Nurse John Burke and Union Representative Gary Grodzicki were
present. *Id.* at ¶85.

Captain Corridoni asked Nurse Burke to administer a
Breathalyzer test on the plaintiff. *Id.* at ¶87.  The plaintiff
asked: "What's this about? Why are you doing this?" *Id.* at ¶88.
However, he was not given any information. *Id.*  Burke attempted
to administer the Breathalyzer test four or five times but did
not get a reading. *Id.* at ¶90.  Lieutenant Seman then grabbed
the Breathalyzer and the plaintiff blew into it two or three
more times. *Id.* at ¶91.  Lieutenant Seman then stated to
Captain Corridoni: "There. There. There. We got a reading." *Id.*
at ¶92. The plaintiff stated to Seman that a month ago Seman
had wanted to write him up for being thirty seconds late and
that now he is being given a Breathalyzer. *Id.* at ¶93.

Captain Corridoni instructed the plaintiff that he was
relieved of his duties and that he was to report to defendant
Deputy Warden Hyder at the Warden's office at 9:00 a.m. *Id.* at
¶¶94 & 95.  Corridoni told the plaintiff that he would have
someone drive the plaintiff home. *Id.* at ¶95. The plaintiff

17

said "this is enough", walked out and drove himself home. *Id.* at ¶¶96 & 98.

The plaintiff was not under the influence of alcohol. *Id.* at ¶99.  He had had a cheeseburger along with four or five beers the prior day on his off time after which he went home and slept for seven hours, woke up at 10:15 p.m, got dressed and reported for work. *Id.* at ¶102.  The plaintiff did not have glassy eyes or slurred speech. *Id.* at ¶104.  He contends that the Breathalyzer test was harassment. *Id.*  This particular Breathalyzer was never used on an officer before. *Id.* at ¶105. It was only used for work-release inmates and it was known to be inaccurate. *Id.* at ¶106.

The LCCF Code of Ethics provides that "[a]n employee shall not report for duty under the influence of intoxicants" and classifies "reporting for duty under the influence of intoxicating beverages, narcotics or drugs" as a first level offense for which the penalty is dismissal. *Doc. 73, Exhibit 3.* The plaintiff had seen the Code of Ethics and was aware that no drinking was allowed at the prison. *Affidavit of Ronald A. Majewski* at ¶100.

18

Prior to the meeting on December 7th with defendant Hyder, the plaintiff met with defendant Seiwell and Union Representative Thomas Borum. *Id.* at ¶108.  The plaintiff informed them that they had tried the Breathalyzer at least seven times before obtaining a reading and that they hated him because of his light-duty job, grievance and EEOC filing. *Id.* at ¶109.  The plaintiff told them that he would go to rehab before he would let them terminate him for a bogus charge. *Id.* at ¶110.  Defendant Seiwell told the plaintiff that, in order to avoid dismissal for drinking, he would have had to have asked for rehab before an incident had occurred. *Id.* at ¶111. The plaintiff responded that Seiwell was nuts and the plaintiff reminded him of instances when other employees had reeked of alcohol or were sent home due to a hangover. *Id.* at ¶112. Before they went into the meeting, the plaintiff was told not to sign anything. *Id.* at ¶113.

At the meeting, defendant Deputy Warden Morris was present in addition to defendant Hyder, the plaintiff, defendant Seiwell and Borum. *Id.* at ¶114.  At the meeting, defendant Hyder pushed a paper in front of the plaintiff and told him to sign it. *Id.* at ¶115.  Defendant Seiwell grabbed the paper and

19

said "Don't sign anything.  We need to have a hearing on this."
*Id.* at ¶115.  Defendant Hyder again asked the plaintiff to sign
the paper but the plaintiff did not even know what the paper
said as it was not close enough for the plaintiff to read it.
*Id.* at ¶116.  Defendant Seiwell said that the plaintiff wasn't
going to sign anything. *Id.* at ¶117.  Deputy Warden Hyder then
told the plaintiff that he was suspended until the next Prison
Board Meeting or Commissioner's Meeting. *Id.* at ¶118.

    After the Union representatives left the meeting, the
plaintiff was alone with the two Deputy Wardens and asked them
what was going on. *Id.* at ¶119.  Defendant Morris told the
plaintiff that the Breathalyzer read .186. *Id.* at ¶120.  The
plaintiff explained that he had not had a drink since the
previous day at 3:00 p.m., that he slept from 3:00 p.m until
10:15 p.m. and that he worked for three and a half hours before
the test was administered and that there was no way the reading
was accurate. *Id.* at ¶121.  The plaintiff said: "You know
that's inaccurate, even on inmates, why are they doing this?"
*Id.* at ¶122.  Defendant Hyder pointed up toward upstairs and
said: "They want you fired." *Id.* at ¶123.  The plaintiff said
"They?  Who are they?" and Hyder just shook his head. *Id.* at
¶124.

                          20

On December 13, 2004, after speaking with his attorney, the plaintiff admitted himself into Choices Rehab. *Id.* at ¶131. He successfully completed the program at Choices and was discharged on December 31, 2004. *Id.* at ¶138.

Attorney Jennings corresponded with the Warden, the Prison Board and their attorneys but there was no return communication. *Id.* at ¶143.

On January 5, 2005, the plaintiff called defendant Fischi and asked about the status of his situation and was told that defendant Hyder was handling the matter. *Id.* at ¶147.  The plaintiff informed defendant Fischi that he was requesting medical leave. *Id.* at ¶148.  The plaintiff made that request so that he could complete the Choices outpatient therapy program. *Id.* at ¶149.  The plaintiff was granted leave under the FMLA. *Id.* at ¶152.  However, without allowing the plaintiff to use all of his sick time or accrued time, the County put the plaintiff on FMLA leave retroactively to December 7th and had it run concurrent with his suspension. *Id.* at ¶¶153-155.

21

After the plaintiff had left messages for defendant Seiwell for over a month, defendant Seiwell finally called the plaintiff on January 21, 2005. *Id.* at ¶158.  Defendant Seiwell told the plaintiff that defendant Hyder and the County attorney wanted him fired. *Id.* at ¶159.  The plaintiff informed Seiwell that the Breathalyzer machine was not calibrated and that no one was certified to give the test. *Id.* at ¶160.  Seiwell responded that it doesn't matter because the County just wants you fired. *Id.* at ¶161.  Seiwell told the plaintiff that he should not have been suspended. *Id.* at ¶162.  Seiwell also told the plaintiff that he needed to file a grievance, that he would get the paperwork ready, and that he would look into the issues the plaintiff was having with his payroll and clothing allowance. *Id.*  On January 26, 2005, Seiwell told the plaintiff to wait, prior to filing a grievance, until his medical leave had expired to see what would happen. *Id.* at ¶164.

On February 16, 2005, the plaintiff completed his outpatient therapy and his family physician cleared him to return to work. *Id.* at ¶166.  The plaintiff faxed the doctor's note to the Union and faxed and mailed it to the prison. *Id.* at ¶167.

22

In February, defendant Seiwell presented the plaintiff
with a Last Chance Agreement for him to sign. *Id.* at ¶168.  The
plaintiff enlisted the Union to try to negotiate a more
favorable Last Chance Agreement than the one presented to him.
*Defendants International Laborers' Union of North America Local*
*1300 and Tony Seiwell's Statement of Undisputed Material Facts*
at ¶14 and *Plaintiff's Counterstatement of Facts to*
*International Laborers' Union of North America Local 1300 and*
*Tony Seiwell's Statement of Material Facts* at ¶14.[1]  The Union
complied with the plaintiff's request and obtained from the
employer some changes to the Last Chance Agreement. *Id.*  The
Union recommended that the plaintiff sign the Last Chance
Agreement. *Affidavit of Ronald A. Majewski* at ¶178.  However,
the plaintiff still objected to some of the provisions and
refused to sign the Last Chance Agreement. *Defendants*
*International Laborers' Union of North America Local 1300 and*
*Tony Seiwell's Statement of Undisputed Material Facts* at ¶¶15-

---

1.  The plaintiff indicates in his response to the Union and
Seiwell's Statement of Undisputed Material Facts that this
statement is "Denied as stated."  However, the plaintiff has not
cited to record evidence disputing this statement.  Therefore, we
consider this statement to be undisputed for purposes of the
instant summary judgment motions.  The same is true for paragraphs
15, 16, 18 and 26 of the Union and Seiwell's Statement of
Undisputed Material Facts.

16 and *Plaintiff's Counterstatement of Facts to International Laborers' Union of North America Local 1300 and Tony Seiwell's Statement of Material Facts* at ¶15-16.  The plaintiff would have retained his job had he signed the Last Chance Agreement. *Id.* at ¶18.

During defendant Seiwell's tenure, no Union member who was represented by defendant Seiwell or the Union in disciplinary processes for violation of the LCCF Code of Ethics policy against intoxication retained his or her position without signing a Last Chance Agreement. *Id.* at ¶26.

The plaintiff's health insurance, life insurance and retirement stopped as of March 7, 2005. *Affidavit of Ronald A. Majewski* at ¶200.

Although he was no longer receiving payments, when the plaintiff returned to work in 2000 he never signed off of Workers Compensation. *Id.* at ¶202.  He received monthly injections, treatments and therapy. *Id.* at ¶203.  After the plaintiff's neurologist advised the plaintiff not to return to work, the plaintiff began to receive Workers Compensation payments again in March of 2005. *Id.* at ¶¶206-208.  The

24

plaintiff received Workers Compensation from March 10, 2005 until he settled on January 11, 2007. *Id.* at ¶211.

On April 13, 2005, the plaintiff sent ten grievances to defendant Seiwell to file on his behalf. *Id.* at ¶212. The plaintiff prepared another declaration for the EEOC on March 14, 2005. *Id.* at ¶213.

After a hearing in May of 2005, the plaintiff received a letter from defendant Fischi stating that Fischi was going to recommend the termination of the plaintiff's employment at the next Prison Board meeting. *Id.* at ¶2215-218.

Defendant Fischi recommended that the plaintiff's employment be terminated. *Defendants International Laborers' Union of North America Local 1300 and Tony Seiwell's Statement of Undisputed Material Facts* at ¶16 and *Plaintiff's Counterstatement of Facts to International Laborers' Union of North America Local 1300 and Tony Seiwell's Statement of Material Facts* at ¶16. A decision to terminate the plaintiff's employment was made by the Prison Board on September 19, 2005. *Affidavit of Ronald A. Majewski* at ¶222.

The plaintiff had observed other people at the prison being sent home for the use of alcohol or based on the assumption that they were under the influence. *Id.* at ¶107. They were never administered a Breathalyzer and/or given discipline as harsh as that given to the plaintiff. *Id.* at ¶222.  The plaintiff provides the names and outlines instances of  others employees who were treated differently than he was with regard to being under the influence of alcohol at work. *Id.* at ¶107a-g.

From December 7, 2004 until his termination the plaintiff was suspended without pay. *Id.* at ¶198.  The plaintiff has not worked since his termination but he would be able to return to work at the prison with the appropriate accommodations. *Id.* at ¶229.

The plaintiff still occasionally drinks alcohol. *Id.* at ¶277.

IV. Discussion.

A. Constitutional Claims.

1. First Amendment Claim.

The plaintiff claims that the individual defendants violated the First Amendment.  The plaintiff's First Amendment claim is based on his right as a public employee to speak on matters of public concern.

Defendant Seiwell argues that the plaintiff has not presented evidence that he acted in concert with any of the County defendants and that, therefore, as a private citizen he is entitled to summary judgment on the plaintiff's First Amendment claim.

A private party may be liable under § 1983 when "(1) the party actually participates with state officials in an activity which is constitutionally prohibited, or (2) the private party conspires with state officials to violate the constitution." *Smith v. Wambaugh*, 29 F.Supp.2d 222, 227 (M.D.Pa. 1998), *aff'd,*

189 F.3d 464 (3d Cir. 1999). *See also Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions."); *Abbott v. Latshaw*, 164 F.3d 141, 147-48 (3d Cir. 1998)("[A] private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts "under color of state law" for purposes of § 1983.").

The plaintiff does not argue that defendant Seiwell was acting as a county employee in his dealings with the plaintiff on behalf of the Union and the plaintiff has not presented evidence from which a reasonable trier of fact could conclude that defendant Seiwell conspired with the County defendants with regard to the plaintiff's suspension and termination. Accordingly, defendant Seiwell is entitled to summary judgment on the plaintiff's First Amendment claim.

The County defendants contend that they are entitled to summary judgment on the plaintiff's First Amendment claim because the plaintiff did not speak out about matters of public concern.

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). Public employers cannot silence their employees simply because they disapprove of the content of their speech. *Id.* at 194. On the other hand, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

A public employee's First Amendment claim of retaliation is evaluated under a three-step process. *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir. 1997). First, the plaintiff must establish that the activity in question was protected. *Id.* Second, the plaintiff must establish that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d

Cir. 1996).  Lastly, the public employer can rebut the claim by
demonstrating that it would have reached the same decision even
in the absence of the protected conduct. *Baldassare, supra,* 250
F.3d at 195.

     "A public employee's statement is protected activity when
(1) in making it, the employee spoke as a citizen, (2) the
statement involved a matter of public concern, and (3) the
government employer did not have 'an adequate justification for
treating the employee differently from any other member of the
general public' as a result of the statement he made." *Hill v.
Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006)(quoting *Garcetti v.
Caballos,* 126 S.Ct. 1951, 1958 (2006)).  "If the speech in
question is purely personal, it does not fall under the
protective umbrella of the First Amendment and public employers
are therefore not limited by that guarantee in responding to
disruption caused by the expression." *Brennan v. Norton*, 350
F.3d 399, 412 (3d Cir. 2003).  "A public employee's speech
involves a matter of public concern if it can be fairly
considered as relating to any matter of political, social or
other concern to the community." *Id.* (quoting *Baldassare,
supra,* 250 F.3d at 195).  "[S]peech may involve a matter of
public concern if it attempts to bring to light actual or

30

potential wrongdoing or breach of public trust on the part of government officials." *Id.* (quoting *Connick v. Myers,* 461 U.S. 138, 148 (1983)).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick, supra,* 461 U.S. at 147-48. "Determining whether a public employee's speech is a matter of public concern is a question of law for the court." *Brennan, supra,* 350 F.3d at 413.

The defendants argue that the plaintiff's speech was not on matters of public concern.

The plaintiff identifies the speech at issue as his complaint to defendant Fischi in June of 2002 about the harassment by his coworkers.  He also identifies the speech at issue as his counsel's letters to Fischi, the Prison Board and the Assistant County Solicitor.  He contends that he was speaking out about a hostile work environment and discriminatory conduct which are matters of public concern.

A public employee speaking about illegal discrimination and harassment may be speaking on matters of public concern.

31

*See e.g. Azzaro v. County of Allegheny,* 110 F.3d 968, 980 (3d Cir. 1997)(holding that report of incident of sexual harassment by an executive assistant to the County Commission was speech on a matter of public concern).  However, not all speech by a public employee regarding discrimination and harassment enjoys constitutional protection. *Id.* (rejecting argument that a grievance about sexual harassment is only a matter of public concern if it includes indications that there is a systemic problem interfering with the public agency's performance of its governmental function and not if the grievance relates solely to the employee's own situation but noting that in rejecting that argument it is not suggesting that all public employee complaints about sexual harassment are matters of public concern).  To determine whether the speech is protected by the First Amendment, the court must look to the content, form, and context of the speech. *McKenzie v. Milwaukee County,* 381 F.3d 619, 626 (7th Cir. 2004).

We start with the plaintiff's June 2002 complaint to defendants Fischi.  On June 11, 2002, the plaintiff met with defendant Warden Fischi. *Affidavit of Ronald A. Majewski* at ¶59.  The plaintiff informed Fischi of the fact that no on was talking to him, that he was isolated and that no one wants to

work with him. *Id.* at ¶61.  He also informed Fischi that the
harassment included the grievance by his coworkers and he asked
Fischi to have them back off and cease the harassment. *Id.* at
¶¶60 & 62.

    We conclude that this speech on the part of the plaintiff
did not relate to a matter of public concern.  The plaintiff
was complaining about how coworkers were treating him.
Although no doubt important to the plaintiff, how the
plaintiff's coworkers treated him was not of political, social
or other concern to the community.

    Next, we address the June 17, 2002 letter from the
plaintiff's attorney to the Warden and President of the Union.
Jennings' letter addressed the grievance by the plaintiff's
coworkers and requested copies of documents relevant to the
grievance. Doc. 84, Exhibit H.  Additionally, Jennings
requested documents pursuant to the Americans with Disabilities
Act. *Id.* Jennings further indicated that the plaintiff is
working under a medical accommodation pursuant to the ADA but
that that medical accommodation does not restrict the plaintiff
from working overtime on days that he is not scheduled for
work. *Id.*  We conclude that this letter also did not relate to

a matter of public concern.  Again, the primary complaint was about the way the plaintiff's coworkers were treating him, which is not a matter of public concern.  The request for documents under the ADA and the indication in the letter that the plaintiff is able to work overtime are also not matters of public concern.

Unlike the prior speech addressed, we conclude that the December 3, 2002 letter from plaintiff's attorney to defendant Fischi and the October 21, 2003 letter from plaintiff's attorney to the Prison Board members did address matters of public concern.

On December 3, 2002, Jennings sent a letter to defendant Fischi. *Doc. 84, Exhibit I.*  Jennings indicated that the suspension of the plaintiff was retaliation and he indicates that other employees were treated differently than the plaintiff with regard to the use of emergency vacation days. *Id.*  He also indicated that the documents that he previously requested were not provided. *Id.*  Jennings requested a discussion toward formulation of a reasonable accommodation and he indicated that the plaintiff is considering initiating an EEOC complaint into harassment resulting from the June 17, 2002

letter. *Id.*  He characterized the harassment as retaliation in violation of the ADA. *Id.*

On October 21, 2003, Jennings sent a letter to Prison Board members stating that the plaintiff was disabled and that he was being retaliated against due to his disability, his EEOC complaint and counsel's previous letter. *Doc. 84, Exhibit Q.* He cited to the Roberts' memo regarding the policy as to action to be taken if the plaintiff were to arrive fifteen minutes late. *Id.*  He also stated that he still had not received a copy of the LCCF's current Code of Ethics and that no dialogue regarding reasonable accommodations under the ADA had been offered. *Id.*

These letters concerned more than just the plaintiff's treatment by his coworkers.  In these letters, the plaintiff's attorney alleged that the plaintiff was being retaliated against by supervisory officials in violation of the ADA. Retaliation in violation of the ADA is illegal, and we conclude that the content of these letters alleging such retaliation addressed a matter of public concern.

35

Having determined that the content of the speech in these letters addressed a matter of public concern, we turn to the form and context of the speech in the letters.  The form and context of the speech is letters from the plaintiff's attorney to the Warden and Prison Board in an attempt to improve the plaintiff's working conditions.  Although the speech was not directed to the public, that does not mean that the speech did not involve a matter of public concern. *See Azzaro, supra,* 110 F.3d at 978 ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context.").  Similarly, although the speech may have been motivated by the plaintiff's desire to improve his working conditions, that does not vitiate the fact that the speech involved a matter of public concern. *Brennan, supra,* 350 F.3d at 413 (stating that speaker's motive is not dispositive in determining whether a particular statement relates to a matter of public concern and that the focus is on the value of the speech rather than the speaker's motivation).

The content of the speech in the letters addressed a matter of public concern, and nothing about the form or context of the speech in the letters causes us to conclude that the speech did not involve a matter of public concern.   We conclude that the individual County defendants are not entitled to summary judgment on the plaintiff's First Amendment claim.[2]

2. Fourth Amendment Claim.

The plaintiff argues in his brief in opposition to the defendants' motions for summary judgment that the Breathalyzer test was an unreasonable search in violation of the Fourth Amendment.   However, the plaintiff's Fourth Amendment claim was dismissed by the Order of April 9, 2007. *See Doc. 57.*

---

2.   The County Defendants argue for the first time in a footnote in their reply brief that they are entitled to summary judgment because the plaintiff's First Amendment claim fails for lack of causation.   We will not address an argument made for the first time in a footnote in a reply brief.

3. Equal Protection Claim.

The defendants have not moved for summary judgment on the plaintiff's Equal Protection claim.  Accordingly, we do not address that claim.

B. American With Disabilities Act Claims.

1. Discrimination Claim.

Count III of the amended complaint is a discrimination claim against Luzerne County, the LCCF and the Union pursuant to the ADA, 42 U.S.C. 12101, et seq.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a *prima facie* case of discrimination under the ADA, the plaintiff must demonstrate that he: 1) has a

38

disability; 2) is a qualified individual; and 3) has suffered
an adverse employment decision as a result of his disability.
*Skerski v. Time Warner Cable Co.,* 257 F.3d 273, 278 (3d Cir.
2001).

The Union argues that the plaintiff has no evidence that
the Union caused an adverse employment action to be taken
against him.  We agree.

The plaintiff attempts to characterize the circulation in
2002 of the grievance against him by his coworkers as an
adverse employment action, and he asserts that a union steward
was involved in the circulation of the grievance.  However,
there is no evidence that any adverse action was taken against
the plaintiff as a result of the circulation of the grievance.
Accordingly, the circulation of the grievance was not an
adverse employment action under the ADA.

The plaintiff's suspension and termination were adverse
employment actions, but the plaintiff has not presented
evidence from which a reasonable trier of fact could conclude
that the Union was responsible for the plaintiff's suspension
or termination.  Rather, the record evidence indicates that the

39

Union attempted, albeit unsuccessfully, to negotiate on behalf of the plaintiff.  Accordingly, the Union is entitled to summary judgment on the plaintiff's ADA discrimination claim based on his suspension and termination.

Defendants Luzerne County and the LCCF argue that the plaintiff was not a qualified individual under the ADA.[3]  They argue that the plaintiff could not perform the essential functions of the job of a correctional officer because he is an alcoholic and he still drinks alcohol.

Under the ADA, a "qualified individual with a disability" means a "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can

---

3.  The plaintiff argues in this brief in opposition that he is disabled.  However, since the defendants have not argued that the plaintiff is not disabled we do not address that issue.

perform the essential functions of that position." *Turner v. Hershey Chocolate U.S.,* 440 F.3d 604, 611 (3d Cir. 2006)(citing 29 C.F.R. § 1630.2(n)). "The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit." *Id.*

Under the ADA, the defendants may prohibit the use of alcohol at the LCCF and may require that employees not be under the influence of alcohol at the LCCF. 42 U.S.C. § 12114(c)("A covered entity . . . may prohibit . . . the use of alcohol at the workplace by all employees [and] may require that employees shall not be under the influence of alcohol . . . in the workplace."). However, the plaintiff disputes that he is an alcoholic. *Affidavit of Ronald A. Majewski* at ¶ 237. He also disputes that he was under the influence of alcohol when given the Breathalyzer. *Id.* at ¶99. Given these disputes, we can not say as a matter of law that the plaintiff was not a qualified individual under the ADA. As the only argument made by the County and the LCCF on the plaintiff's ADA discrimination claim is that the plaintiff was not a qualified individual under the ADA, we conclude that defendants Luzerne County and the LCCF

41

are not entitled to summary judgment on the plaintiff's ADA
discrimination claim based on his suspension and termination.

2. Retaliation Claim.

Count IV of the amended complaint is a retaliation claim
against Luzerne County, the LCCF and the Union pursuant to the
ADA.

The ADA contains an anti-retaliation provision.  The ADA
provides that "[n]o person shall discriminate against any
individual because such individual has opposed any act or
practice made unlawful by [the ADA] or because such individual
made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a).
"Thus, it is unlawful for an employer to retaliate against an
employee based upon the employee's opposition to anything that
is unlawful under the ADA." *Williams v. Philadelphia Housing
Auth. Police Dept.,* 380 F.3d 751, 758-59 (3d Cir. 2004).

"To establish a prima facie case of retaliation under the
ADA, a plaintiff must show: (1) protected employee activity;
(2) adverse action by the employer either after or
contemporaneous with the employee's protected activity; and (3)

42

a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997).

As indicated above, the plaintiff has not presented evidence that the Union was responsible for the plaintiff's suspension or termination.  Accordingly, the Union is entitled to summary judgment on the plaintiff's ADA retaliation claim.

Defendants Luzerne County and the LCCF argue that the distant temporal proximity between the plaintiff's filing of his EEOC complaint and his termination supports an inference that there was no causal connection between the two events. Asserting that the plaintiff has not presented any other evidence of causation to support his retaliation claim, they argue that the plaintiff can not carry his burden and that they are therefore entitled to summary judgment.  The plaintiff responds that his retaliation claim is not limited to the filing of his EEOC complaint, but rather also includes his complaints and grievances to the prison officials and the Prison Board.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against him. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.,* 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997)). "Conversely, however, '[t]he mere passage of time is not legally conclusive proof against retaliation.'" *Id.* (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993). Where timing is not unusually suggestive of a causal connection standing alone, courts may look to other evidence that gives rise to an inference of causation. *Id.* For example, actual antagonistic conduct or animus against the employee during the intervening period may demonstrate causation. *Id.* Also, other types of circumstantial evidence, such as inconsistent reasons given by the employer for the action or the employer's treatment of other employees may give rise to an inference of causation. *Id.* Evidence that the reason given for the adverse action was

pretext may also be relevant to the issue of causation. *Weston v. Pennsylvania,* 251 F.3d 420, 432 (3d Cir. 2001).

The plaintiff has presented evidence[4] that he was treated differently than other employees with regard to being late and using emergency leave.  He has also presented evidence that the reason given for his suspension was pretext.  He asserts that he was not intoxicated and he asserts that when he said to defendant Hyder that the Breathalyzer was inaccurate and when he asked "why are they doing this?", defendant Hyder pointed up toward upstairs and said "They want you fired." *Affidavit of Ronald A. Majewski* at ¶¶122-123.  This evidence is sufficient for a reasonable factfinder to find a causal connection between the plaintiff's suspension and subsequent termination and his complaints and grievances.  Accordingly, defendants Luzerne County and the LCCF are not entitled to summary judgment on the plaintiff's ADA retaliation claim.

---

4.  Whether the incidents involving the treatment of other employees would be shown to be based upon the plaintiff's personal knowledge, or could be established through a combination of his own observations and other evidence, is an issue that we will not resolve against the plaintiff in this summary judgment context.  We will consider the plaintiff's sometimes conclusory assertions of differing treatments of different employees to be based upon personal knowledge.

C. FMLA Claims.

Count VII of the amended complaint is a claim against defendants Fischi, Hyder and Morris pursuant to the FMLA, 29 U.S.C. § 2601-et seq.

"The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). "The FMLA endeavors to accomplish these purposes 'in a manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29 U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct." *Id.* Eligible employees are entitled to a total of twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of his or her position. *Id.* Following a qualified absence, the employee is entitled to be reinstated to his or her former position or an

46

alternative one with equivalent pay, benefits and working conditions. *Id.* During FMLA leave, the employer generally must maintain coverage for the employee under any group health plan. 29 U.S.C. § 26114(c). Under certain circumstances, however, the employer may recover the group health plan premiums paid if the employee fails to return to work after the FMLA leave. *Id.*

"Additionally, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions." *Callison, supra,* 430 F.3d at 119. "Employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Id.* (quoting 29 C.F.R. § 825.220(c)).

Although the plaintiff admits that he was granted FMLA leave, the plaintiff argues that defendants Fischi, Hyder and Morris interfered with his use of the FMLA leave by putting him on FMLA leave retroactively to December 7, 2004 and by not first allowing him to use accrued sick or personal leave before beginning the FMLA leave.

47

The FMLA provides provide that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" following the occurrence of a qualifying event. 29 U.S.C. §2612(a). "If an employer provides paid leave for fewer than 12 workweeks, the additional weeks of leave necessary to attain the 12 workweeks of leave required under [the FMLA] may be provided without compensation." 29 U.S.C. § 2612(d)(1). The FMLA further provides that "[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided" under the provision of the FMLA regarding leave because of a serious health condition of the employee. 29 U.S.C. § 2612(d)(2)(B). An employer may construe as FMLA leave any leave that an employee is taking as a result of a qualifying event. *Johnson v. Morehouse College, Inc.*, 199 F.Supp.2d 1345, 1356 (N.D.Ga. 2002). The FMLA sets a minimum standard of twelve weeks of unpaid leave. *Id.* "To allow an employee, after the occurrence of a qualifying event, to manipulate the date on which she elects to take FMLA leave would effectively permit the employee to unilaterally amend the statute to allow herself a leave of absence in excess of the twelve weeks provided for by law." *Id.*

48

The plaintiff had no right under the FMLA to use accrued sick or personal leave before his FMLA leave began,[5] and he had not right to unilaterally set the date his FMLA leave would begin.  Moreover, the plaintiff received twelve weeks of FMLA leave.[6]  Accordingly, we conclude that defendants Fischi, Hyder and Morris are entitled to summary judgment on the plaintiff's FMLA interference claim.

The plaintiff also argues that attempting the get him to sign the Last Chance Agreement after he exercised his rights under the FMLA was illegal.  However, the plaintiff has not presented evidence to support a reasonable inference that the presentation to the plaintiff of the Last Change Agreement or the plaintiff's subsequent termination was causally connected to his FMLA leave.  Accordingly, we conclude that defendants

---

5.  We conclude only that the plaintiff does not have a claim under the FMLA. To the extent that the plaintiff may not have been paid for accrued sick or personal leave the plaintiff may have a claim under some other statute or common law theory.

6.  The plaintiff indicates that he entered inpatient rehabilitation on December 13, 2004. *Affidavit of Ronald A. Majewski* at ¶131.  He also indicates that his health insurance stopped on March 7, 2005. *Id.* at ¶200.  The period from December 13, 2004 to March 7, 2005 is twelve weeks.

Fischi, Hyder and Morris are entitled to summary judgment on the plaintiff's FMLA discrimination claim.

     D. State Law Claims.

     Count V of the amended complaint is a claim against all of the defendants pursuant to the Pennsylvania Human Relations Act (PHRA).  Count VI of the amended complaint is a state law conspiracy claim against all of the individual defendants. Count IX of the amended complaint is a state law claim of wrongful discharge against Luzerne County, the LCCF and the Union.

     Defendants Luzerne County and the LCCF argue that the plaintiff's state law claims are based on the Pennsylvania Constitution, that challenges brought under the Pennsylvania Constitution are subject to the same analysis as those brought under their federal counterparts, that the plaintiff's federal constitutional claims fail, and that, therefore, his state claims also fail.  However, the plaintiff's state law claims are not based on the Pennsylvania Constitution.  Therefore, defendants Luzerne County and the LCCF are not entitled to

summary judgment on the plaintiff's state law claims on this basis.

Defendants Luzerne County and the LCCF also argue that this court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims because the plaintiff's federal claims fail as a matter of law.  However, we have concluded that the some of the plaintiff's federal claims should survive summary judgment.  Thus, the court should not decline to exercise supplemental jurisdiction over the plaintiff's state law claims.

1. PHRA Claims.

Count V of the amended complaint is a claim against all of the defendants pursuant to the PHRA, 43 Pa.C.S.A. § 951, et seq.  The plaintiff alleges in the amended complaint that the defendants individually and jointly acted to violate the plaintiff's rights under the PHRA causing a hostile work environment and that they discriminated against him because of his non-work related disability and retaliated against him because he engaged in protected activity with the EEOC and PHRC. *Amended Complaint at ¶ 68.*

51

Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, including the ADA. *Salley v. Circuit City Stores, Inc.,* 160 F.3d 977, 979 n.1 (3d Cir. 1998).  The Third Circuit has held that a claim under the PHRA is coextensive with a claim under the ADA. *Id.*

We have already concluded that defendant Union is entitled to summary judgment on the plaintiff's ADA claims but that defendants Luzerne County and the LCCF are not entitled to summary judgment on the plaintiff's ADA claims.  Accordingly, we conclude that defendant Union is entitled to summary judgment on the plaintiff's PHRA claims but that defendants Luzerne County and the LCCF are not entitled to summary judgment on the plaintiff's PHRA claims.

2.  Conspiracy Claim.

Count VI of the amended complaint is a state law conspiracy claim against all of the individual defendants. The plaintiff alleges in the amended complaint that the defendants met and openly discussed the charges and claims that were going to be made against him in an effort to have him

52

resign or, in the alternative, to have him terminated. *Amended Complaint at ¶70.* The plaintiff alleges that in furtherance of their plan, the defendants acted in concert and reviewed and discussed the efforts they would become involved in in order to establish the false charges against him that resulted in his termination. *Id. at ¶71.*

In order to establish a cause of action for civil conspiracy under Pennsylvania law, a plaintiff must establish: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *Kline v. Security Guards, Inc.,* 386 F.3d 246, 262 (3d Cir. 2004).

Defendant Seiwell argues that in his dealings with the plaintiff he was acting as an agent of the Union and that the plaintiff has not presented evidence that he engaged in a conspiracy with the other individual defendants.

As evidence of a conspiracy involving defendant Seiwell, the plaintiff points to: 1) statements by defendant Seiwell to

53

the plaintiff that defendant Hyder and the County want the
plaintiff fired, 2) the fact that defendant Seiwell was the
individual who presented him with the Last Chance Agreement; 3)
the fact that defendant Seiwell told the plaintiff that if he
did not accept the last chance agreement he would be out work;
4) the fact that the Union came up with the Fourth Last Chance
Agreement; and 5) the fact that the Union untimely filed the
plaintiff's grievances.

     None of the above facts, alone or in combination, support
an inference that there was a conspiracy involving defendant
Seiwell and the other individuals defendants.  The plaintiff
has not presented evidence from which a reasonable trier of
fact could conclude that defendant Seiwell conspired with the
other defendants.  Accordingly, defendant Seiwell is entitled
to summary judgment on the plaintiff's conspiracy claim.

          3. Wrongful Discharge Claim.

     Count IX of the amended complaint is a state law claim of
wrongful discharge against Luzerne County, the LCCF and the
Union.

Defendant Union argues that it was not the plaintiff employer and that it did not make the decision to terminate the plaintiff, and that, therefore, it is entitled to summary judgment on the wrongful discharge claim.

As indicated above, there is not sufficient evidence for a reasonable trier of fact to conclude that the Union was responsible for the plaintiff's suspension or termination or that defendant Seiwell, the agent of the Union, conspired with the County defendants with regard to the plaintiff's suspension and termination.  Accordingly, we conclude that defendant Union is entitled to summary judgment on the plaintiff's wrongful discharge claim.

V.    Recommendations.

Based on the foregoing, it is recommended that the motion (doc. 66) for summary judgment filed by defendants Seiwell and the Union be granted and that defendant Seiwell be granted summary judgment on the plaintiff's First Amendment claim, that the Union be granted summary judgment on the plaintiff's ADA claims and PHRA claims, that defendant Seiwell be granted summary judgment on the plaintiff's conspiracy

claim, and that defendant Union be granted summary judgment on
the plaintiff's wrongful discharge claim.  It is further
recommended that the motion (doc. 70) for summary judgment
filed by the County defendants be granted in part and denied in
part.  It is recommended that defendants Fischi, Hyder and
Morris be granted summary judgment on the plaintiff's FMLA
claims.  It is otherwise recommended that the County
defendants' motion for summary judgment be denied.  Finally, it
is recommended that the case be listed for trial on the
remaining claims.

/s/ J. Andrew Smyser
J. Andrew Smyser
Magistrate Judge

Dated:  January 22, 2008.