# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONALD A. MAJEWSKI,** | : | **No. 3:05cv2396** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **LUZERNE COUNTY,** | : | |
| **LUZERNE COUNTY CORRECTIONAL** | : | |
| **FACILITY,** | : | |
| **GENE FISCHI,** | : | |
| **SAMUEL HYDER,** | : | |
| **ROWLAND ROBERTS,** | : | |
| **TONY SEIWELL,** | : | |
| **INTERNATIONAL LABORER'S** | : | |
| **UNION OF NORTH AMERICA LOCAL** | : | |
| **1300,** | : | |
| **GREGORY SKREPENAK,** | : | |
| **TODD VONDERHEID,** | : | |
| **STEVE URBAN,** | : | |
| **WEBSTER YUHAS, and** | : | |
| **ROBERT PAYNE,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are plaintiff's objections (Docs. 109) to the report and recommendation (Doc. 108) of Magistrate Judge J. Andrew Smyser, which proposes that we grant the defendants' motions for summary judgment. Having been fully briefed, the matters are ripe for disposition.

## Background

This case grows out of plaintiff's employment at the Luzerne County

Correctional Facility (LCCF), where he worked as a guard. Plaintiff began his employment at the LCCF in 1991. (Defendants Luzerne County, Luzerne County Correctional Facility, Gene Fischi, Samuel Hyder, Joseph Morris, Rowland Roberts, Gregory Skrepenak, Todd Vonderheid, Steven Urban, Robert Payne and Wister Yuhas's ("County Defendants") Statement of Material Facts as to Which no Genuine Issue Remains to Be Tried (Doc. 71) (hereinafter "County Defendants' Statement) at ¶ 4).[1] Plaintiff sustained a work-related injury in early March 1994. (Id. at ¶ 5). While restraining an inmate, plaintiff herniated a disk in his back. (Defendants International Laborers' Union of North America Local 1300 and Tony Seiwell's ("Union Defendants") Statement of Undisputed Material Facts (Doc. 67) (hereinafter "Union Defendant's Statement") at ¶ 2). He finally returned to work on October 10, 2000. (County Defendant's Statement at ¶ 6). Plaintiff served in a permanent light duty job as a control booth guard from that date. (Id.). In April 2003, plaintiff filed a complaint with the Equal Employment Opportunity Commission that alleged that the defendant prison had retaliated against him because he sought accommodations for his injury pursuant to the Americans with Disabilities Act (ADA). (Id. at ¶ 7).[2]

---

[1]All the parties filed statements of fact. The court will cite to the defendants' statements where the facts are undisputed. The court will explain where the facts are disputed.

[2]The complaint in question was marked by the notary as being filed on April 17, 2002. (See Exh. 5 to County Defendants' Statement). The plaintiff listed the date as April 17, 2003 when he signed the document, however. In addition, the events narrated in the complaint largely occurred after 2002. The court will therefore accept April 17, 2003 as the date plaintiff filed the complaint.

In the late evening and early morning of December 6 and 7, 2004, plaintiff arrived for work at the LCCF and was asked to take a breathalyzer test. (Id. at ¶ 8). Around 2:30 a.m. on December 7, plaintiff was called to his captain's office and ordered to take the exam. (Plaintiff's Deposition (Exh. 2 to County Defendants' Statement) (hereinafter "Defendant's Dep.") at 31). Plaintiff admits that he drank four or five beers and ate a cheeseburger on the night in question, but insists that he slept for seven hours after eating and drinking and was not under the influence of alcohol when he arrived at work. (Plaintiff's Response to Union Defendants' Statement (hereinafter "Plaintiff's Response to Union") (Doc. 82-4) at ¶ 6). Plaintiff blew into the device two or three times for the nurse administering the exam. (Id.). After the device provided no reading, another prison official, Lieutenant Semon, grabbed the breathalyzer from the nurse and ordered the plaintiff to blow into it four or five more times. (Id.). Finally, Semon got a reading from the machine. (Id.). The captain immediately informed plaintiff that he had been relieved of his duties. (Id.). Plaintiff alleges that the device had never before been used to check a guard or other prison employee. (Id. at 32). The prison used it only to test inmates on work release. (Id.). Plaintiff contends that he never saw such a test administered on another employee and never saw anyone sent home because they were under the influence of alcohol. (Id. at 32-33).

Later that morning, Deputy Warden Samuel Hyder informed plaintiff that he had been suspended without pay pending possible termination at the next Prison

3

Board meeting. (County Defendants' Statement at ¶ 9). This suspension came because plaintiff had allegedly violated prison rules. (Union Defendants' Statement at ¶ 7). The LCCF Code of Ethics classifies "reporting for duty under the influence of intoxicating beverages or narcotics on facility property" as a first level offense. (Id. at ¶ 10). The penalty for such offenses is dismissal. (Id.). Plaintiff contends that the policy was applied inconsistently. (Plaintiff's Response to County Defendants' Statement (Doc. 82-3) (hereinafter "Plaintiff's Response to County") at ¶ 10). Several other guards had been disciplined for arriving at work under the influence of alcohol, and had received much more favorable treatment than the plaintiff did. (Id.). None of these other workers had returned from work after suffering an injury and been assigned light duty, as plaintiff was. (Id.).

Plaintiff entered an alcohol rehabilitation program on December 13, 2004. (County Defendants' Statement at ¶ 11). Plaintiff contends that he did so only because he feared for his job. (Plaintiff's Response to County at ¶ 11). On January 5, 2005, plaintiff requested medical leave. (Plaintiff's Response to County at ¶ 12). Plaintiff testified at his deposition that he felt that prison officials perceived him as an alcoholic because "[t]hey assumed I was drinking when I was on duty." (Plaintiff's Dep. at 84). Before December 7, 2004, no one at the prison had ever "mentioned" that plaintiff was an alcoholic, and plaintiff never felt that anyone perceived him as suffering from that condition. (Id. at 85). After his stint at the rehabilitation clinic, however, prisoner officials and employees "naturally assumed that [he] was." (Id.).

The prison placed plaintiff on leave retroactive to December 7, 2004. (Plaintiff's Response to County at ¶ 12). Plaintiff contends that he did not ask his leave to be made retroactive, nor was he credited for time he had accrued under the Family and Medical Leave Act. (Id.). The defendants terminated plaintiff's benefits ninety days after December 7, 2004. (Id.).

The County Defendants offered plaintiff a "last-chance agreement" which would have allowed him an opportunity to return to work at the LCCF. (County Defendants' Statement at ¶ 13). The Union Defendants assisted plaintiff in his attempt to negotiate more favorable terms for this agreement. (Union Defendants' Statement at ¶ 14). Defendant Tony Seiwell participated in this process. (Id.). The parties disagree about the extent of the changes plaintiff obtained during this negotiation. Plaintiff agrees, however, that he objected to provisions in the proposed agreement that required him to participate in follow-up care, mandated termination if he violated the agreement, and forfeited his ability to grieve the incident. (Id. at ¶ 15). Plaintiff also contends that he expressed concern about privacy reports. (Plaintiff's Response to Union's Statement at ¶ 15). Plaintiff refused to sign an agreement, though he contends that he still intended to negotiate such an agreement when the prison board fired him. (Id.). On September 19, 2005, the prison board terminated the plaintiff. (County's Statement at ¶ 14).

Plaintiff filed a complaint, a motion to proceed *in forma pauperis* and a motion for appointed counsel (Docs. 1-3) in this court on November 18, 2005. The

magistrate judge gave the complaint an initial screening.  On December 7, 2005 he recommended that the court dismiss the complaint without prejudice.  (Doc. 4).  The plaintiff then obtained counsel and the court granted him leave to file an amended complaint.  (Doc. 8).  The plaintiff filed his amended complaint on January 10, 2006.  Count I of that complaint, brought against all the individual defendants pursuant to 42 U.S.C. § 1983, alleges a violation of plaintiff's rights under the First, Fifth and Fourteenth Amendments to the United States Constitution.  Count II, brought pursuant to 42 U.S.C. § 1985, alleges that the individual defendants conspired against plaintiff in retaliation for claims he brought before the EEOC and under the Pennsylvania Human Relations Act (PHRA), 43 P.S. §§ 955(a) *et seq*.  Count III alleges violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq*.  Count IV alleges retaliation under the ADA.  Count V brings discrimination and retaliation claims under the PHRA.  Count VI claims a conspiracy to violate plaintiff's rights under Pennsylvania law.  Count VII contends that defendants Fischi, Hyder and Morris violated plaintiff's rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq*.  Count VII alleges that all defendants engaged in intentional infliction of emotional distress.  Count IX claims wrongful discharge against the County, the LCCF and the Union.

Defendants filed motions to dismiss the amended complaint.  The magistrate judge recommended that the court grant those motions in part and deny them in part.  (Doc. 47).  He recommended that the court dismiss plaintiff's Fifth Amendment

substantive and procedural due process, 42 U.S.C. § 1985(3), punitive damages and intentional infliction of emotional distress claims. The court adopted this report and recommendation and remanded the case to Magistrate Judge Smyser so that the parties could conduct discovery. (Doc. 57). The defendants filed motions for summary judgment (Docs. 66, 70) at the close of discovery, and the magistrate judge issued a report and recommendation proposing that the motions for summary judgment be granted in part and denied in part (Doc. 86).

Both sets of defendants filed objections to the report and recommendation. After considering these objections, the court adopted the report and recommendation in part and denied it in part. (See Doc. 95). The court concluded that summary judgment. was appropriate for the defendants on all of plaintiff's claims, but that the magistrate judge had not addressed an equal protection claim raised by the plaintiff. As such, the court ordered the case remanded to magistrate judge so that the parties could brief the issue of summary judgment on this claim. The parties did so, and the magistrate judge issued the instant report and recommendation, which recommends that the court grant the defendants summary judgment on this equal protection claim. The plaintiff objected to this finding, and the parties briefed the issue, bringing the case to its present posture.

**Jurisdiction**

Because this case is brought pursuant to the 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.,* and the Family and Medical Leave

7

Act, 29 U.S.C. §§ 2601, *et seq.*, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. §. 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

**Legal Standard**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made. 28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

Before the court is the Magistrate Judge's recommendation that we grant Defendants' motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

8

See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

Plaintiff raises several objections to the magistrate judge's report and recommendation. The court will address each in turn.

**A.  The Magistrate Judge's Finding that Plaintiff Could Not Prevail on a "Class of One" Equal Protection Theory**

The plaintiff objects to the Magistrate Judge's recommendation that his equal protection claim be dismissed. Plaintiff contends that the magistrate judge improperly analyzed the claim on a "class of one" basis, when he should have considered plaintiff as part of a "suspect or quasi-suspect class," based on plaintiff's actual and perceived disabilities. Plaintiff contends that the evidence indicates that defendants treated him differently from other guards because of his back injuries and alcoholism.[3]

Contrary to the plaintiff's position, the magistrate judge did address plaintiff's equal protection claim on the basis of his claimed disability. <u>See</u> Report and Recommendation (Doc. 108) at 13. The magistrate judge concluded that disparate treatment on the basis of a disability was subject to "rational basis" review, and that plaintiff could point to no evidence that indicated that he was treated differently from

---

[3]The plaintiff also complains that the Magistrate Judge "reversed himself" by finding in his initial report and recommendation that plaintiff had spoken on a matter of public concern when he complained about his working conditions and concluding in this report and recommendation that plaintiff could not use his equal protection claim as another means of making a First Amendment retaliation claim. The plaintiff is correct that the Magistrate Judge determined that plaintiff had spoken on a matter of public concern. This court, however, declined to adopt that portion of the report and recommendation, finding that plaintiff's speech was a purely personal employment matter and did not implicate the First Amendment. In making his current determination on this matter, the magistrate judge merely followed the dictate of this court.

others similarly situated because of his disability.

In any case, the Fourteenth Amendment establishes that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" Shuman v. Penn Manor School Dist., 422 F.3d 141, 151 (3d Cir. 2005) (quoting U.S. Const. Amend. XIV, § 1).  This section "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  A party seeking to prevail on a Section 1983 equal protection claim "must prove the existence of purposeful discrimination." Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).  "To bring a successful claim under 42 U.S.C. § 1983 for denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990). Further, the plaintiff must prove he "'received different treatment from that received by other individuals similarly situated.'" Id. (quoting Kuhar v. Greensburg-Salem School Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)).  In the context of sex discrimination, the plaintiff must prove that the disparate treatment was based on her gender. Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992).

The situation here, however, is one where plaintiff asserts he was treated differently on the basis of his disabilities.  Plaintiff points to several instances where other individuals were found intoxicated while at work and did not receive the same punishment that plaintiff did.  Instead of being threatened with dismissal for being intoxicated at work, these officers were merely "sent home," and did not find

11

themselves without jobs.  (See Exh. 2 to County Defendants' Appendix to their

Statement of Facts (Doc. 100) (hereinafter "Plaintiff's Dep.") 101-3; Exh. NN to

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 84)

(hereinafter "Plaintiff's Summary Judgment Brief") at ¶ 107).[4]   He also points to

numerous incidents where defendants treated him differently from others who did not

have similar problems with their backs.[5]  Plaintiff contends that he was docked pay

for being late to work, while other guards did not face such sanction.  (Id. at 71, 94-5,

125).  Supervisors did not give plaintiff the same opportunity to use sick days and to

set his schedule as they gave other guards.  (Id. at 113-14).  Plaintiff's affidavit also

indicates that his coworkers complained about having to work with a person with a

disability, and that supervisors did nothing to discipline them for such complaints.

(See Exh. NN to Plaintiff's Summary Judgment Brief (Doc. 84) at ¶ 65z).

Plaintiff's claim here is that he was discriminated against because he had a

disability–either a back injury or alcoholism.  The court has already found, however,

that plaintiff could not prevail on claims pursuant to the Americans with Disabilities

Act (ADA) related to these conditions.  In that sense, in contending that he was

---

[4]Plaintiff testified that he was unaware whether these individuals signed "last
chance" agreements after being sent home for intoxication.  (Plaintiff's Dep. at 103).

[5]Part of plaintiff's evidence for this disparate treatment is the fact that his co-workers
signed a grievance, complaining that they had to perform extra duties when they worked
with him.  (Plaintiff's Dep. at 76).  Since plaintiff's mobility was limited by his back
problems, guards working on a shift with him had to perform extra rounds.  (Id.).  Plaintiff
testified that he knew that the grievance had been prepared, but was unaware that if it had
ever been filed.  (Id. at 64).

denied equal protection on the basis of his disability, plaintiff is attempting to relitigate his ADA claims as equal protection claims.  The Supreme Court has held that "classifications based on disability" violate the Equal Protection clause of the Fourteenth Amendment "if they lack a rational relationship to a legitimate governmental purpose." Tennessee v. Lane, 541 U.S. 509, 523 (2004).  The ADA "seeks to enforce this prohibition on irrational disability discrimination" through its prohibitions on discrimination in workplace and in public accommodations. Id. Though the ADA seeks to enforce the Fourteenth Amendment's Equal Protection provisions as they relate to disabilities, courts have found that "[i]n comparing the protections guaranteed to the disabled under the ADA . . . with those limited protections guaranteed under the rational basis standard of the Fourteenth Amendment, it is clear that the former imposes far greater obligations and responsibilities on the States than does the latter." Lavia v. Pennsylvania, 224 F.3d 190, 200 (3d Cir. 2000).  Here, then, since plaintiff could not prevail under the standards of the ADA–which prohibits more conduct than does the Equal Protection clause–he could not prevail on a Section 1983 claim based on his disability.  The court will therefore adopt the report and recommendation on this point.

The magistrate judge also found that plaintiff may have attempted to raise a "class of one" equal protection claim, but found that the United States Supreme Court, in Engquist v. Oregon Dept. of Agriculture, 128 S.Ct. 2146, 2151 (2008) had concluded that the theory does not apply to the public employment context.  In his

brief in support of his objections, plaintiff appears to acknowledge that he could not prevail under that theory, arguing that the Magistrate Judge uses that standard "to dismiss the claim on the grounds that the Class of One Theory of Equal Protection does not apply in the employment context" after Engquist.  (Plaintiff's Brief (Doc. 110) at 3).  In any case, the court agrees with the magistrate judge that a plaintiff cannot prevail on a class-of-one theory in this context.   See Engquist, 128 S. Ct. at 2151 (finding that "the class-of-one theory of equal protection does not apply in the public employment context").  Because plaintiff has introduced no evidence by which he could prevail on an equal protection claim, the court will adopt the report and recommendation on this point.

### B.  The Magistrate Judge's Finding that the Defendants Union and Seiwell Did Not Engage in State Activity

Though the court has found that plaintiff could not prevail on his equal protection claim, the court will in the interest of completeness address the claim of the union defendants that they could not be liable under Section 1983 because they are not state actors.  The parties in this instance agree that those defendants can be liable only if they can be considered state actors.  The union defendants argue that they are not, while the plaintiff contends that the union and Seiwell joined with the other defendants in attempting to compel plaintiff to sign a "last chance" agreement. This concerted activity makes the union defendants state actors and compels the court to find that they could be liable under 42 U.S.C. § 1985, the section of the civil rights statute that prohibits conspiracies designed to violate a plaintiff's rights.

14

At his deposition, plaintiff described the meeting where he was asked to sign the "last chance" agreement. After being sent home following his allegedly positive breathalyzer test, plaintiff arrived at 9 a.m. the next morning for a meeting with the Warden and Deputy Warden. (Plaintiff's Dep. at 35-36). Present at the meeting were Warden Fischi and Deputy Warden Hyder, as well as Tony Seiwell, the union business agent and union representative Thomas Borham. (Id. at 36). At the meeting, Deputy Warden Hyder "pushed a paper in front of" plaintiff, requesting that he sign it. (Id.). Seiwell, "grabbed" the paper from in front of plaintiff, telling him: "Don't sign anything. We need to have a hearing on this." Despite continued requests from the Deputy Warden that he sign the document, plaintiff followed the business agent's advice. (Id. at 34). He never even read the document. (Id.). Seiwell informed the wardens that "he's not signing nothing. He shouldn't sign anything." (Id.). The meeting ended without plaintiff signing the document. (Id. at 37-38). After a brief conversation with two deputy wardens, plaintiff left the room and met his union representatives outside. (Id. at 40). The representatives gave him their cell phone numbers and told plaintiff they would contact him about the situation. (Id. at 40). Plaintiff tried to call these men, but they did not respond. (Id. at 41). Eventually, plaintiff entered an in-patient alcohol rehabilitation program; he made Defendant Seiwell aware of this treatment. (Id. at 49).

Plaintiff eventually completed his treatment and was cleared by a doctor to return to prison. (Id. at 51-52). He provided a statement from his doctor to the

union's business agent. (Id. at 52). At that point, the business agent provided him with an agreement to sign before he returned to work.[6] (Id.). Plaintiff refers to this document as a "last chance" agreement. (Id.). Plaintiff read the agreement and disagreed with it. (Id.). He refused to sign. (Id.). Plaintiff rejected the agreement because it refused to provide him pay during the period when he sought treatment, allowed the prison to monitor his compliance with the rehabilitation program, and limited his ability to file grievances. (Id. at 56-57). Plaintiff discussed his dissatisfaction with the agreement with Seiwell, and submitted a revised agreement to him. (Id. at 57). Plaintiff testified Seiwell had told him he would negotiate with the prison about the terms of this agreement, and that Seiwell had informed him that he had spoken with the county's attorney about plaintiff's concerns with the document. (Id. at 127). During the period of these negotiations, plaintiff received more than one such proposed agreement to sign[7], and had offered the county his own proposed

---

[6]The union defendants provided a copy of this agreement as an exhibit to their motion for summary judgment. (See Exh. C to Union Defendants' Motion for Summary Judgment (Doc. 68)). The proposed agreement references the incident that led to plaintiff's suspension, relates that plaintiff was suspended for this incident and then sought treatment for alcoholism, and establishes that "Majewski, the Public Service Employees' Union, Local 1300 (the "Union") and the Facility wish to enter into an agreement governing Majewski's return to work at the facility." (Id.). The agreement lays out terms for this return to work, including successful treatment of alcohol rehabilitation, compliance with future treatment, abstention from drugs and alcohol while at work and a pledge to maintain satisfactory work perform. (Id.). Additionally, plaintiff agreed that he would be terminated if he violated the agreement's terms, though he could grieve that termination. (Id.). The prison agreed not to take any disciplinary action against the plaintiff for the instance in question. (Id.). Plaintiff would also receive no pay for the period where he was off of work, and he and the union would not grieve the incident on December 7, 2004. (Id.).

[7]This second agreement differed from the one discussed in footnote 5, *supra*, in that it referenced the fact that plaintiff had been on a workers' compensation leave of absence

16

version of the agreement.  (Id. at 128).[8]  Plaintiff testified that the union eventually

recommended he sign such an agreement, since he would be allowed to continue

working if he complied with its terms.  (Id. at 143-44).

On May 4, 2005, Warden Gene Fischi wrote plaintiff to inform him that his

refusal to sign the last chance agreement provided him by Seiwell had led the prison

to schedule a hearing to address the incident on December 6 and 7, 2004.  (See

Exh. AA to plaintiff's statement of facts (Doc. 84)).  At that hearing, Fischi reported,

plaintiff could appear "with union representatives and any witnesses" he chose to

bring.  (Id.).  The hearing represented plaintiff's "opportunity to respond to the

allegations of misconduct related to the December 6-7 incident."  (Id.).  Since the

hearing represented an "internal investigation," plaintiff could not bring his own

counsel, but could have representation provided by his union.  (Id.).  This hearing

occurred on May 12, 2005.  (Plaintiff's Dep. at 130).  Defendant Seiwell appeared to

---

unrelated to the December 2004 incident.  (See Doc. 100-2).  The second document also
changed wording related to plaintiff's completion of alcohol treatment.  That document also
added a paragraph that maintained that "[n]othing in this Agreement is intended to affect or
interfere with the rights and/or responsibilities of any party under workers compensation
laws."  (Id.).

[8]During his deposition, counsel for the union defendants read to plaintiff a portion of
his amended complaint that alleged that "'[t]he defendants met with each [sic] and openly
discussed the aspect of the charges and claims that were going to be made against the
plaintiff in an effort to have him voluntarily resign his position or, in the alternative, be
terminated.'" (Plaintiff's Dep. at 135).  Defense counsel asked plaintiff when that meeting or
meetings occurred, and plaintiff described them as "just verbal over the phone.  In person, I
met [Seiwell] at the union hall.  I met him outside the prison."  (Id.).  Asked to describe "the
attendees and the content of any specific meeting that you're referring to in paragraph 70,"
plaintiff responded that "I spoke with Seiwell, Tony Seiwell."  (Id. at 136).

represent the plaintiff. (Id.). The decision to terminate plaintiff did not occur at this hearing. (Id. at 139). Instead, the warden recommended that plaintiff be fired on August 31, 2005, and the prison took such action on September 18, 2005. (Id.).

The magistrate judge found that plaintiff had advanced no evidence that indicated that Defendant Seiwell and the Defendant Union were state actors in this instance. To maintain a case against such defendants, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). "State action is a threshold issue in a Fourteenth Amendment claim." Abbot v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998). This "under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999) (quoting Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)). A party acts "under color of state law" when "the allegedly unconstitutional conduct is fairly attributable to the State." Id. Courts have articulated various means of determining when a private actor like Defendant Seiwell or the Union acted "under color of state law," but "the facts are crucial." Crissman v. Dover Downs Entm't, 289 F.3d 231, 234 (3d Cir. 2002).

A court begins this examination by first "identifying 'the specific conduct of which the plaintiff complains.'" Sullivan, 526 U.S. at 51. Once the conduct is identified, courts have divided state activity into two broad categories. "The first

18

category involves an *activity* that is significantly encouraged by the state or in which the sate acts as a joint participant." <u>Leshko v. Servis</u>, 423 F.3d 337, 340 (3d Cir. 2005). The inquiry here "requires tracing the activity to its source to see if that source fairly can be said to be the sate. The question is whether the fingerprints of the state are on the activity itself." <u>Id.</u> The other category of cases "involves an *actor* that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." <u>Id.</u> In these cases, the court asks "whether the state so identifies with the individual (or entity) who took the challenged action that we deem the state's fingerprints to have been on the action." <u>Id.</u>

The parties disagree over whether the union defendants can be considered state actors in this instance. Plaintiff argues that a factual dispute exists as to "whether the Union and Seiwell joined with the other defendants in presenting the 'Last Chance Agreement.'" (Plaintiff's Brief at 6). Plaintiff contends that his termination was caused by his failure to sign this "last chance" agreement, which the union and the other defendants prepared together. Because the parties worked together to prepare this agreement, plaintiff insists that Seiwell and the union were "willful participants with the County in a common purpose which has been shown to exist between both the State actors (the County) and the Union and Seiwell." (<u>Id.</u>).

The union defendants contend that plaintiff's termination came not because he failed to sign the "last chance" agreement, but because, after a hearing, the prison

determined that his employment should end.  The failure to sign the agreement, therefore, was not the cause of plaintiff's injury and therefore plaintiff's complaints about the process of procuring the "last chance" agreement are immaterial.  The court finds, however, that evidence exists by which a jury could conclude that plaintiff lost his job in part because he did not sign the "last chance" agreement he was offered.  Warden Fischi, after all, wrote to the plaintiff to inform him that the hearing that ultimately led to his termination was taking place because plaintiff refused to sign the agreement defendants offered him.  If plaintiff had agreed to sign the "last chance" document, he would not have faced the investigation or the threats of termination he later did.  Both the "last chance" agreement and the investigation that followed plaintiff's failure to sign the agreement were prompted by the same incident, plaintiff's alleged intoxication at work on December 6 and 7, 2004.

The focus of the court's determination, therefore, must be on whether the presentation of the "last chance" agreement to the plaintiff represented state action. Plaintiff alleges that the union and the prison worked together to achieve his termination.  As a general matter, a union is not a state actor for the purpose of Section 1983.  Figueroa v. City of Camden, 580 F. Supp. 2d 390, 401 (E.D. Pa. 2007).[9]  An exception to this rule against converting a private actor into a state

---

[9]Indeed, if the court were to follow the general rule that "[s]tate action may be found if the private party acted with the help of or in concert with state officials," a union engaging in negotiations with a government entity could not possibly be liable as a state actor. McKeesport Hosp. v. Accreditation Council for Graduate Medical Education, 24 F.3d 519, 524 (3d Cir. 1994).  The union's role in such negotiations is to advance the interests of a party generally standing in opposition to the employer.  Here, if we were to assume that the

actor exists, however, when the private individual conspires with a state actor to deprive the plaintiff of his rights. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970) (holding that "a private party involved in such a conspiracy [to violate plaintiff's rights], even though not an official of the State, can be liable under § 1983."); Abbot v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998). To maintain such a claim, the plaintiff must prove the elements of a civil conspiracy. Melo v. Hafer, 912 F.2d 628, 638 n.11 (3d Cir. 1990). Such a conspiracy is "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit an unlawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" Smith v. Wambaugh, 29 F. 2d 222, 228 (3d Cir. ) (quoting Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979)).

Plaintiff does not point to any evidence that shows the union and prison officials did anything together except negotiate to establish the terms of the last-chance agreement that plaintiff refused to sign. Plaintiff does not cite evidence that indicates that the parties intended to present plaintiff with an agreement they knew

---

union played its proper role in this instance, the court would probably find that the prison sought to terminate plaintiff as quickly as possible, and the union attempted to negotiate terms on which the plaintiff could keep his job. A jury could not find that such negotiation represented an action in concert or action achieved with the help of the state.

[10]The Third Circuit Court of Appeals addressed this issue in an unpublished opinion. See Johnson v. Int'l Bhd. of Teamsters, 256 Fed. Appx. 481, 483 (3d Cir. 2007). The court recognizes that the Court of Appeals has admonished district courts not to cite to unpublished opinions.

he would refuse to sign, or that the union and the prison ever met together to establish a scheme to eliminate plaintiff's employment. He does not present evidence to indicate that the union even wanted plaintiff fired at this time.[11] Instead, the evidence indicates that the union acted as plaintiff's advocate in a situation where his employment was threatened, attempting to secure an agreement from the prison not to terminate him. The mere act of negotiating an agreement does not, without some evidence of bad faith or collusion designed to work contrary to the plaintiff's interests, constitute an act of common purpose.

This case is like <u>Jackson v. Temple University of Commonwealth System of Higher Education</u>, 721 F.2d 931 (3d Cir. 1983). In that case, plaintiff was terminated by his employer after being accused of stealing surgical scrub pants. <u>Id.</u> at 932. Plaintiff filed a grievance after his firing, and–pursuant to his contract–his union handled the grievance procedure. <u>Id.</u> The employer denied the grievance after a hearing. <u>Id.</u> The union then wrote the plaintiff and informed him it would not press his grievance further. <u>Id.</u> The circuit court found that the Union had not acted under color of state law, because plaintiff had not "set forth any facts suggesting that the state was responsible for the Union or that the Union was acting under color of state law in deciding not to bring [plaintiff's] grievance to arbitration." <u>Id.</u> at 933.

Plaintiff similarly offers no evidence here that the prison directed his union's

---

[11]Plaintiff does allege that Defendant Seiwell two years earlier had expressed a desire to see him fired, but does not present any evidence that this attitude persisted, or that Seiwell's actions in this instance were motivated by such a desire.

decision in relation to the "last chance agreement," and no evidence that the union acted under color of state law.  Thus no state action by the union or Defendant Seiwell occurred.  The court will adopt the report and recommendation on this point.

**Conclusion**

For the reasons stated above, the court will overrule the plaintiff's objections and adopt the report and recommendation.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD A. MAJEWSKI,** | : | **No. 3:05cv2396** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **LUZERNE COUNTY,** | : | |
| **LUZERNE COUNTY CORRECTIONAL** | : | |
| **FACILITY,** | : | |
| **GENE FISCHI,** | : | |
| **SAMUEL HYDER,** | : | |
| **ROWLAND ROBERTS,** | : | |
| **TONY SEIWELL,** | : | |
| **INTERNATIONAL LABORER'S** | : | |
| **UNION OF NORTH AMERICA LOCAL** | : | |
| **1300,** | : | |
| **GREGORY SKREPENAK,** | : | |
| **TODD VONDERHEID,** | : | |
| **STEVE URBAN,** | : | |
| **WEBSTER YUHAS, and** | : | |
| **ROBERT PAYNE,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

**AND NOW**, to wit, this 15th day of June 2009:

1.  The plaintiff's objections to the report and recommendation of Magistrate

Judge J. Andrew Smyser (Doc. 109) are hereby **OVERRULED**;

2.  The report and recommendation (Doc. 108) is hereby **ADOPTED**;

3.  The defendants' motions for summary judgment are hereby **GRANTED**;

24

and

4.  The Clerk of Court is directed to **CLOSE** the case.

**BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**